v. Express Scripts, 238020. Can I proceed, Your Honors? Hold on a second, please. You've lost a lot of your audience. Okay. Please proceed. Thank you. Good morning, Your Honors. Glenn Kurtz from White & Case on behalf of Anthem. Anthem provides health care coverage to tens of millions of Americans and sued ESI for overcharging for prescription drugs. I will try to cover three of the District Court's errors in granting summary judgment against Anthem. First, the standard on the summary judgment motion below, of course, was to construe all facts, draw all reasonable inferences, and resolve all ambiguities in favor of the non-moving party. Here, the Court did the opposite, resolving highly contested facts against Anthem and doing so based solely on ESI's evidence, without addressing or even acknowledging Anthem's contrary evidence. Importantly, the District Court did not find that Anthem's evidence failed to raise a genuine issue of material fact. It simply ignored Anthem's 203 page 56-1 statement, supported by 200- Why isn't this just a question of interpreting the contract? Your Honor, that is one of the three issues I want to address. I think the factual finding is effectively dispositive. Why is there a factual finding at all? Don't we just look at what the provision calls for? You maintain that that provision establishes that Express Scripts was guaranteeing, I'm not sure what exactly to call it, competitive pricing. Is that a fair term to call it? What the provision 56 provided for was it required ESI to negotiate in good faith in order to, quote, ensure Anthem was receiving competitive pricing. Whoa, whoa, whoa, whoa, whoa, whoa, what does it say, that? Where does it say that they are to negotiate in good faith towards a particular end? Right. As opposed to simply to negotiate in good faith with respect to your proposal to change the contract terms? So, Your Honor, the first paragraph, the first sentence, I should say, sets out the objective of the negotiation, which is, and this is the exact language, to ensure, well, point now- No, that's what you're supposed to, what you're doing is either yourself or through an outside contractor reviewing the prices to ensure, I guess that's the key word, that it represents competitive pricing. Correct. How could you ever ensure that? You're not guaranteeing that it is competitive pricing. You're determining whether it is competitive pricing. Your Honor, I believe that sets out the objective of the negotiation. Let me explain why I believe that to be true. One is we review contracts in context. And the context here, and it's undisputed, that a standard way to protect customers in long-term contracts about being overcharged for prescription drugs is through a market check. The parties agree that ESI promised Anthem that it would ensure competitive pricing through the term of the agreement. Where in the contract do they make that promise? So in the contract, the second sentence says that if Anthem determines it's not receiving competitive pricing, it then makes a proposal to ESI for competitive pricing, and then ESI is obligated to negotiate in good faith over Anthem's proposal for competitive pricing. We believe that makes very clear, especially in the context of what a market check is. At the end of the day, regardless of how this contract is interpreted, there's got to be, all there's got to be is a good faith negotiation. Your Honor, that's right. And the claim here was that there was a breach of the obligation to negotiate in good faith. That breach was not disputed on the motion below. It was assumed. Yes, this is something that puzzles me about this entire process. We have what purports to be a summary judgment motion, but the summary judgment motion, in order to be a valid summary judgment and escape all the arguments that you're going to make about they're really about facts, is that they've assumed them away by assuming your position. So it is assumed that they did not negotiate in good faith. And I guess I'm going to have to ask them what the heck they mean by that. If they don't mean what you say they mean by that, which is that they did not negotiate in good faith towards the goal of competitive pricing. Correct, Your Honor. And it wasn't disputed in the motion below. It was assumed. I believe it was no one moved for summary judgment because that's a highly factual issue, whether or not the negotiations were in good faith. Having assumed bad faith, a breach of the obligation to negotiate in good faith and, in fact, bad faith, the issue really moved to damages. And that's what the court did. I would, though, before moving. That's a separate issue than the one we've been discussing. It is. It is, Your Honor. And that has a significant impact on damages. It did. It did. And before moving maybe to that, depending on where the court wants to hear argument, I did want to just go back, Your Honor, and note why the resolution of a disputed issue of fact really drove the decision on the interpretation of 5-6. Because the court made a factual finding adopting ESI's highly contested factual assertion that it had never provided Anthem with competitive pricing and, therefore, wasn't required to provide competitive pricing in the market check. That Anthem had traded away competitive pricing for an upfront payment. And having found, of course, that Anthem never had competitive pricing, it was not far for the court to find, nor would you therefore get it. We'd have to first determine whether there is ambiguity in this contract term because all of the stuff that you've just said only comes into play as a matter of extrinsic evidence of the negotiating process and so on, which the district court, as I read it in the alternative, said even if this is ambiguous, they still win because the overwhelming evidence establishes by extrinsic evidence this is what the negotiating history was. And you're contesting that. I think the prior question has to be what ambiguities are there in this clause that need to be resolved by resort to either side's extrinsic evidence, right? Right, right. So I'd respond two ways, Your Honor. One is that the court did interpret the word insure as meaning check. The plain and ordinary meaning of insure is to make sure. The dictionary definition of insure is to make sure. The word insure was used in other places in the agreement. What do you make of that third sentence, the notwithstanding clause? Because I think that that seems to trump your reliance on the word term insure. So, Your Honor, the third sentence is there because there is an amendment clause that requires amendments to be in writing. The ESI's executives each testified, and it's obvious, that the obligation to document the results of a good faith negotiation was part of the good faith negotiation obligation, that obviously parties couldn't sit down, negotiate, reach terms on competitive pricing, and then refuse to document it. The evidence is also that ESI never asked for a veto right, as is reading it here, and Anthem never agreed to a veto right, and no one from ESI interpreted the third sentence as a veto right. That was something that was conceived by counsel in the case. How would one insure competitive pricing? What would that look like? So, Your Honor, this is a common provision for insuring that parties are not overcharged for prescription drugs. I don't understand what you're saying. Let me get an answer to my question. I'm going to come right back. I have a very good answer, Your Honor. I'm going to come right back. Judge Parker, the answer is that there is a volume of data coming from ESI's own files as to what competitive pricing is. That ESI calculated precisely what the pricing terms were for Anthem during the market check. In other words, you folks as experts in this business know it when you say it. Not only do they know it, Your Honor, but they calculated it specifically for Anthem. They made an offer to Anthem for 2020 at the end of the agreement, which contained every precise term. They assessed and made determinations as to which health plans were comparable to Anthem. We have those terms. Again, Anthem was proposing terms that were less favorable to it than that. They had company-wide guidelines, so pricing terms that were willing to go out on a company-wide basis. Anthem's terms were less favorable to it than that as well. While there was no evidence that ESI rejected any customer on the terms that Anthem was, and there's also expert testimony on top. Thank you. Sorry, it goes back to what do you mean by overcharged? Right. Because there are contract terms that already exist as to what you're going to be charged, and that's what they charged you, right? Right. So, Your Honor, there's a number of answers. I want to give you a fundamental answer on how the pricing works, but I want to start with the notion and with the fact that there is evidence in the record that in addition to calculating what competitive pricing terms were, ESI actually calculated the amount that it was going to receive by not making a move in response to market pricing as in excess of what it was entitled to and calculated that at over $5 billion, assuming its own position on the trade-off. But let me be more specific with you what it means to overcharge. We're not in a situation where Anthem was to pick a number being charged $10 for insulin. Right. They're getting a percentage discount off some specified benchmark price. Right. Right. So instead of saying Anthem was being charged $10 and now it wants to be charged $9.50, which is effectively ESI's argument, what happened was because the formula for pricing is AWP, Average Wholesale Price, which is a third-party reference number, disassociated from actual cost or actual market pricing. What happened is when AWP went up, PBMs, in order to achieve market pricing, had to increase the discounts. And the evidence is that ESI increased the discounts for everyone but Anthem. I'm not sure I understand that. In other words, if the price in the contract is not $2 for insulin, it's for this category of drugs, you get a 40% discount off the benchmark price. Right. If the benchmark price goes up and down, why shouldn't it stay 40%? You're asking it to change the percentage discount. So the pricing at the cash register effectively is, as you would expect, whatever the proper pricing would be accounted for costs and what a profit margin would be. There is AWP which moves not with cost and not with pricing. So if you start with, let's say, an AWP of $10 for insulin and you have a $0.70 discount, and that's approximately what it was back in 2009, you have a $3 profit margin in that circumstance. AWP went up, let's say, to $20. If you don't make an adjustment, you now have a 70% discount off of $20 and you've literally doubled. But in the market, insulin hasn't gone up in price because insulin has an increase in cost and insulin has an increase in price. And so this formula drove up a price artificially based on a third-party reference cost. The way the market deals with that. What is the third-party reference cost based on if not the market price? It's not based on the market price and that's not disputed. It's based on, it takes into account any number of factors including rebates and other matters, but it is disassociated with the actual cost. And that's not disputed on this record and that can't be disputed on this record. And so the reason that you have market checks, the reason this is an industry customary provision, is because the AWP can move in a way that's disassociated with the actual pricing. PBMs are required to adjust their discounting in order to restore the pricing that had been provided so that tens of millions of Americans aren't overcharged for prescription drugs. That's undisputed that that is a common industry standard provision for protecting against overpricing. And the reason it's there is because you're not looking at pricing. You are looking at a formula and one component of the formula is outside of cost and outside of control. And the other portion of the formula has to be adjusted to normalize your pricing. And that's the purpose of a market check. And the evidence is that ESI adjusted its discounts, increased its discounts across the board, except to AMPA. So let me ask you a few questions because there are a few other issues. But the first question is, is there in the industry a provision like 5.6? I'm assuming that one way of doing it is to, instead of having this requirement of good faith negotiation, actually requiring ESI to provide you with a competitive price. Is that correct? Right. So the provisions are commonplace. The precise language of them varies from contract to contract. I'm asking you a question sort of outside of this record, but what is the provision outside of the contract with ESI? Are there market checks that actually allow the purchasing party to impose the pricing? I don't think there's any market check that allows the purchasing party to impose the pricing, but there are market checks that would allow the customer to terminate the agreement and go buy drugs from somebody offering competitive pricing in the event that the PBM doesn't agree. And then my second question goes to the, let's go past for a moment the language of the provision 5.6 and get to the extrinsic evidence. What is your best evidence? Because they present in this record quite a bit of evidence that both on their side and on Anthem's side, people viewed the ESI's ability to have a good faith negotiation without ultimately resetting the price. That's pretty clear. What is your best, in this record, evidence to the contrary? So our best evidence, Your Honor, is that, one, ESI promised that it would ensure competitive pricing through term and agreed to a market check. So you're going back to the reading of 5.6? Right, when we started. Secondly- Wait, wait, wait, wait. I think the question was about extrinsic evidence. Did you just accept that this is not, what you just said is not extrinsic evidence but is going back to the terms, the language of this? No, I'm sorry, Your Honor. I was trying to cite to extrinsic evidence where there was a- Okay, so what exactly, who says that they promised, and what are the words of the promise, and where do we find that? All right, can you grab me the site? I'm sorry, I'm going to grab you the site, but it was in presentations made in connection with the proposal to be selected as the transact- The original negotiations. Correct, correct, Your Honor. They promised that there would be competitive pricing. Right, and also annual rate- Where is that? I'm going to get you the site right away, Your Honor. You've got some time for rebuttal, but- Right, and I will pull that site. Okay. Additionally, Your Honor, the testimony of Xanthan would not have moved forward in an agreement without an ability to get repriced based on changes in the marketplace. ESI agreed that market checks are intended to require PBM to reset pricing in the event market pricing changes. ESI calculated in the market check that it was going to be receiving over $5 billion more than it was, quote, entitled to based on a failure to make changes based on the market pricing. So after the fact, there's a Mr. Turner who became the president of the pharmacy division? Is that- I'm not sure about that, Your Honor. Okay, well, he's on your side. Right, he is, he is. And at 1150 of the supplemental appendix, he says, we know that whoever does the survey, the market survey, they will find that we are lacking in the overall pricing area. We will then take that back to ESI and we'll try to negotiate a better deal, but they do not have to accept that. Yet it is in their best interest to get us better pricing so that we retain business. Right. And so forth. And then there's, in other parts of this record that I'm reading, another executive from Anthem, as well as outside consultants with McKinsey, who all seem to believe, and maybe it's after the fact of the original agreement, that ESI does not have to provide competitive pricing. Right. And they also understand that maybe we can use our leverage in certain areas to terminate the business after the 10-year period. Maybe there's some other things that we can do to force ESI's hand in connection with providing competitive pricing, but we can't ultimately make them under this contractual provision. What is the, and maybe this again is a rebuttal, as a matter of the extrinsic evidence, what is the best evidence that contradicts that? Well, it includes, Your Honor, and I want to go back because there's testimony around those emails as well. But before addressing what the testimony was about. Other people, by the way, seem to say, yes, that's. Well, there's no evidence that they were involved, and you continue to read the email. It goes on to say, yet the pricing has gotten further and further away from competitive pricing. Yes. The purpose of a market check is to adjust for that, and that is why ESI calculated. But the question here before us is what obligation was placed on ESI? ESI. They assume, for purposes of summary judgment, that they have failed in their obligation to conduct good faith negotiations. And I believe there's a separate question about that, procedurally and otherwise. But you are asking us to assign to ESI an obligation, put on ESI an obligation based on 5.6 to actually provide competitive pricing. In effect, Your Honor, but it's really to negotiate in good faith for competitive pricing. The record is that ESI is providing competitive pricing to everyone but Anthem. The record is that ESI provided competitive pricing to Anthem at the outset and guaranteed in the negotiations that it would continue to do so. There's a difference between negotiating in good faith towards competitive pricing and negotiating in good faith, period. In other words, at any point in the contract, I take it, at any point during the 10 years, you could say we're having a hard time with these prices. It's really killing us, and we'd like you to consider changing the deal. And if they said, okay, we'll negotiate, we'll sit down. And we can talk in good faith, and we can talk until we reach an impasse. But at the end of the day, they say, gee, we're sorry, but we don't think you're that hot off. And we think that our pricing is fair enough, and we like the money that we're making on it. And sorry, but we can't reach an agreement. And I think Your Honor's hypothetical makes the point to the extent that, unlike that normal circumstance where you just ask somebody for something and they agree or not, this was an explicit, important contract provision. So, again, it comes back to the obligation. In other words, I take it no one is contending that this is an obligation to give competitive pricing, period, as determined by some good faith outside observer. As would, for example, you could imagine an arbitration provision built into this that says, you know, every three years or whatever it is, we're going to look and see if we're getting competitive pricing. And if we're not, we're going to propose something. And then we'll negotiate about what competitive pricing really means and what the numbers would be. And if we can't reach agreement, there's an arbitrator who will decide objectively what's competitive pricing. And then we'll be bound by that. That would be one kind of obligation. This is clearly short of that. I would say, Your Honor, it's different than that. And so we have an undisputed breach of the obligation to negotiate in good faith. That is undisputed, and that alone means one should be going to trial. Yes, but they're saying that that's just like a typical type two agreement to agree, that this is like we were trying to negotiate a royalty term or whatever other kind of thing people negotiate over. And we thought we had a deal, but it depends on working out a whole host of details. So we're going to negotiate in good faith to get those details. And the problem there is that under New York law, your damages are limited if the other side just says, well, sorry, we're walking away. Because maybe they found a better deal somewhere else, which would be in bad faith. They weren't really trying to get to an agreement. But you can't get damages based on what hypothetical good faith negotiators might hypothetically have arrived at. So, Your Honor, that would be right for a type two contract.  This is not a type two. Which means that it has to depend on there being some obligation plugged into the provision that we've been talking about. And it's an undisputed obligation. It's an undisputed breach of the obligation to negotiate in good faith. Right. Undisputed. But if it's just a breach of the obligation to negotiate in good faith because we both want to get to yes, but you don't really want to get to yes, that's the kind of agreement that New York law says you're not going to get damages in the form of a hypothetical what would reasonable good faith negotiators have reached. Well, Your Honor, I believe, one, that the objective is stated. It's to negotiate in good faith over Anthem's proposals for competitive pricing. And that's what ESI admits is the purpose of a market check. Because it is an obligation to negotiate in good faith towards competitive pricing.  That's what you have to establish that this provision, as a whole, in context, with or without extrinsic evidence, means. Right. But, Your Honor, the words are to ensure Anthem is receiving competitive pricing. If not, Anthem makes a proposal for the competitive pricing and then ESI has an obligation to negotiate over that proposal for competitive pricing. Negotiations, especially contractual ones at three-year intervals that involve a year-long process with professionals, have to have commercial meaning. And I don't think, I think by definition, the meaning is, because that's what, even outside of these words, even outside of using competitive pricing twice. That's what these provisions do. And Your Honor noted, if you don't reach an agreement in an agreement to agree, you walk away. Anthem couldn't walk away. Anthem was bound by an exclusive contract to provide drug coverage to tens of millions of Americans, paid billions of dollars out of pocket, and wasn't returned to status quo. But that's the status. That is the status quo, though. The status quo is the baseline price in the agreement. That's different than a status quo when two people who don't have any prior relationship get together and are trying to establish one. They return to a status quo that we're both free agents and we both walk away. Here, the status quo is what the contract agreed to. That's the status quo in a breaching environment, in a performance environment where parties under the bedrock damage principles get the benefit of their bargain. The status quo is competitive pricing, how it started in 2009, what they promised. And I want to be clear that ESI executives agreed in their testimony that they promised to maintain competitive pricing. ESI made representations to the Securities Exchange Commission, so pretty serious place to be careful, that not only was it competitive pricing, but it would have to stay that way to be successful. The reason it changed is because there was an industry change where it went from you had to have consolidated medical service coverage and prescription drug service coverage, so ESI would be bidding effectively with them through Anthem, to deconsolidating that and ESI became a competitor. Just to be clear, what you just said seems to me to be the answer that you would make to Judge Lohier's question, because now you're citing here's some of the best extrinsic evidence are things that their executives said to the SEC and things that their executives said about the prior negotiations. Correct. And it raised a question of fact. We're here, we've never had our day in court. We didn't even have oral argument on this. So we have your argument, and we'll get to maybe damages of rebuttal. Yes. Because I believe that's maybe the key. I am noticing the time, Your Honor. Thank you very much. But we'll hear from you, we'll hear from your friends on the other side, and we'll hear from you. Thank you very much, Your Honor. It's an all quid of annual day today. It is. We're switching sides, Your Honor, of the podium. Good morning, Judge Lohier. Good morning, Your Honors. Derek Schaefer here on behalf of Defendant Appellee Express Scripts. Your Honors, the district court's grant of summary judgment, in our view, follows inexorably from settled New York law and undisputed facts and Judge Lynch, the language of the contract. When you read it all together, this is a textbook case under New York law for foreclosing speculation about the supposedly ordained outcome of a good faith marriage case. Let me go back to the language here. This is a sort of strange way to say, every three years, propose possible changes and we'll think about them. This is a very strange way to say that, right? Because they can't do that. They can't just come back to it. I guess they could because you always could. But the contractual provision has a triggering mechanism, right? This negotiation is not supposed to be just, they don't like the terms anymore, they're going to propose a change. This has to be triggered by their finding out that there is not competitive pricing. Why the heck is that in the contract? Well, to be sure, Judge Lynch, it is a bespoke provision that reflects both sides negotiating back and forth for their respective rights. I want to be clear, Judge Lynch. It is absolutely Anthem's right under Section 5.6 to test the market for competitive benchmark pricing, and if they find the absence of it, then they have the right to come back to ESI. They're trying to ensure that they're getting competitive pricing. Sure. Like you would ensure that your flight is on time by checking the board. Because when I look at the departure board to ensure that they haven't changed what was proposed to me as the departure time, that's what I'm looking to see. I don't, you wouldn't use that word to say, I turned on the news last night to ensure that I won the lottery by checking my numbers against the numbers that actually won. Because there's no preexisting expectation that the plane is going to leave at the same time. There's no preexisting expectation that you're getting competitive pricing. Respectfully, Judge Lynch, I think it would be in the due diligence context that you would have a buyer who says, I'm going to check fair market value to ensure I'm getting that. And then you might have a provision that says what happens if the due diligence indicates the absence of that. My friend for the other side relies upon the proposition that it is self-executing. You can simultaneously determine that there's an alleged absence of it. Go to court and have a court award the delta as damages. This is a provision that doesn't work that way. It says what happens is ESI has to negotiate in good faith. That's a binding contractual obligation that we do not deny as a binding contractual obligation. So how, if at all, is that kind of negotiating in good faith different than what would occur under a clause that just said, every three years, if Anthem doesn't like the numbers, they can propose something and we'll negotiate in good faith. It gives you some baseline for the negotiations. You know that part of the negotiations, the good faith negotiations, are about competitive benchmark pricing. That's not exclusive. That is not outcome determinative, Judge Lynch, but it sets up the good faith negotiation, and it is a relevant data point for it. It is just not outcome determinative. But you have stipulated. Let me ask you this. Why was this kind of, why was, what is the genesis of this provision? I mean, I think we all agree that it's a somewhat unusually worded provision. What does the record show the parties are trying to do? I think that if you look at Supplemental Appendix 115, that's where you'll see Exhibit A, Judge Parker, and that lays out the 10-year pricing under this agreement. So it's a very long-term contract. It's entered in 2009, and the parties are looking out over that arc of time and saying, what do we project the market and AWP, as Mr. Kurtz was referring to, what's going to happen with that? ESI is locked in, Judge Parker. There's no right for ESI to change the discounts if the market is moving at its expense, and ESI is also paying $4.7 billion, $4.7 billion up front to Anthem for Anthem's PBM business as its initial investment in this contract. So ESI wants to make sure that it's not giving Anthem too much in the way of an ability to do the price check, but it is making sure, Judge Lynch, that Anthem has a memorialized ability to undertake the price check for this procedure every three years. It is also obligating itself to negotiate in good faith, and if there's a breach, Judge Lynch, if there's a breach, there can be damages, there can be injunctive relief, whatever else. Why would your counterparty here, I mean, I'm a party to a contract. Things are going swimmingly for me. I'm making a lot of money. I'm unclear on why I would agree to gear down my profit margin. Well, to be clear, ESI did undisputedly agree to do that. It did that during the first price check. It did that through exception pricing that was valuable to Anthem. It just didn't bring Anthem to what Anthem contends as competitive benchmark pricing. In the second price check that we're talking about, Judge Parker, ESI made further concessions, concessions that Anthem now tells you are worth billions of dollars that Anthem declined. So through this process, there are real returns that are made available to Anthem at the bargaining table, and Anthem declines, and, of course, if there's an alleged breach, I want to be clear, Judge Parker, they can hold ESI accountable in court through perhaps injunctive relief, through reliance damages. What they cannot do is proceed on the sole theory of damages and remedy that they offer to the Southern District of New York because this provision is crystal clear that the obligation that ESI has is simply to negotiate in good faith, and New York law is crystal clear that a breach, a breach of a binding contractual obligation to negotiate in good faith cannot be remedied in the sole way that Anthem sought to do that. But what do you mean when you stipulate that you did not negotiate in good faith? Could you explain to me what you did in bad faith according to that stipulation? Well, you have to hear Mr. Kurtz on that. I don't think that there was bad faith, Judge Flint, for purposes of summary judgment. I'm sorry, excuse me, excuse me. This whole supposed summary judgment motion is set up, I think whoever on your side did this is very clever, is set up by stipulating away certain things, but what is the stipulation? What is the content of it? What does it mean to say that you did not negotiate in good faith? What is the obligation that you breached? It's the same breach that was at issue in L7 designs that this Court decided and in Fairbrook that the Eighth Circuit decided, a breach of a binding obligation to negotiate in good faith. In both of those cases, New York law was applied exactly the same way that Judge Ramos applied it here. New York law meant that the acknowledged or found breach of a binding contractual obligation to negotiate in good faith could not be remedied through expectancy damages. Someone made a cost analysis that we're willing to accept damages under one theory in order to avoid attorney's fees associated with proceeding. But the damages that normally would be, the reliance damages, is our wasted time and the lawyer fees and the accountant fees and whatever that we invested in the negotiation, right? That's what it normally is. In the good faith negotiation, yes. If both parties can just walk away and nobody's got an agreement, what you're saying is that we return to the status quo, meaning that they have to keep paying the original pricing that was set in Exhibit A back in the day. Let me respectfully disagree on both scores. As to whether there was a binding contractual agreement in other New York cases decided under New York law, L7 designs answers that. There was a binding contract there, Judge Lynch. The parties were under a contractual agreement. There was a second contractual overlay, and it was speculation about that that could not be the basis for damage. Exactly analogous to this, we also cite the Necky case when Justice Marshall was sitting on this Court where it was an existing lease, a binding lease, and a breach of an obligation to renew that lease. And again, Justice Marshall said, okay, we've got one contract here, but that doesn't enable you to posit what would the outcome have been over a negotiation over an extension. Here, we had Exhibit A. We had agreed pricing terms throughout 10 years. It was possible, and it was subject to Section 5.6, that you could have a good-faith negotiation that would strive towards some sort of a modification if the parties agreed. But that's not – that doesn't dictate the outcome of that. You could have an impact. What if it says to strive towards a particular goal? Can I point to the second sentence, Judge Lynch, because I think that there may be a false premise, and Mr. Kurtz, I don't think, helped with it. The second sentence says that the obligation that ESI has is to negotiate in good faith over the proposed new pricing terms. That is not – I don't think that equates with saying that they're negotiating solely to achieve competitive benchmark pricing. The proposal is the centerpiece. That's what starts the – that's the centerpiece of the negotiation. It's the baseline. It's just not the end of the schedule yet. And let me point to what is undisputed in terms of these facts, if I may. It is undisputed, Your Honors, that Anthem was saying at the time of the second price check there could be zero consideration, zero consideration of the $4.7 billion upfront payment that ESI had made and any returns it might need to make off that. You can find that in the record and Anthem's admission to it at CA 381-82. It is undisputed that Anthem was pressing operational claims for hundreds of millions of dollars in alleged liability against ESI that it wasn't willing to drop or to discount. That's at CA 396-404. It is undisputed that from Anthem's own consultants and its own high-level people, as you were alluding to, Judge Loyer, that there was a tradeoff between the amount of this very large upfront payment – So on the – is it $4.6 billion? $4.67 billion. $4.67 billion. Is there something in the record that shows that ESI paid a premium above the other bids or – I don't think it compares it to the other bids, Judge Loyer. I'm not familiar with that in the record. It says here's what the level of discounting would have been had it been a much lower upfront payment of $500 million. Just as you would expect, consistent with the economic laws of gravity. If ESI paid Anthem less upfront, Anthem was going to get deeper discounting. What Anthem now contends is competitive benchmark pricing. Well, of course, what Anthem says is it didn't accept – those are both your bids, right? You bid two different things, better prices and less money upfront for the – what it sounds to me from your side is the putatively worthless NextRx thing that you're buying from them. And the other has a much higher upfront price for that component of the deal and less good prices for them. Their position is yes, but actually they didn't take either of those deals. They got more money and better prices than you had proposed. That's true, Judge Lynch. How do we factor that into this? Judge Loyer asked about what was the overall dynamic of all the bids and where Express Script stood. And I would point the court respectfully to the confidential appendix 28992 where you can see across all of the bids. I'm sorry, Your Honor. 28992. And you will see that everyone around these bids, Anthem and all of its experts knew when there's a higher upfront payment, there is less discounting. Everyone knew that. And it was demonstrated across all the bids. That was clear, right? But it was made irrelevant by Anthem in the position it took at the time of the second price check. And Judge Loyer, you asked about the extrinsic evidence. You'll wait to hear from Mr. Kurtz about that. But I would point to the extrinsic evidence surrounding the negotiation where there were different drafts exchanged. And when Anthem said they should have a unilateral right to insist upon competitive benchmark pricing as part of this provision, ESI said no. We cannot do that precisely because we're paying you this gargantuan upfront payment. We need to be able to protect our interest and our return on that. So we're not going to give you a guarantee of competitive benchmark pricing. We won't even, Judge Lynch, agree to have a neutral arbiter determine whether something was what was called price neutral. That was available to the parties. We didn't do that. Instead, we got to this very bespoke provision in Section 5.6. And then, even after that agreement was entered, at the time of the first price check, the one that preceded the 2015 price check, it is also undisputed, Your Honors, that Anthem did not come away with competitive benchmark pricing. Now, Mr. Kurtz can tell you that that was charity on Anthem's part, that they had a contractual right.  It doesn't have to be charity. You negotiated and you reached an agreement. Well, Judge Lynch, I think it has to be that if there was the ability on their parts at the time of the first price check to go to court claiming that ESI's failure to give them at the bargaining table the full amount that Anthem would have needed in order to get competitive benchmark pricing was its damages from the negotiation. And even for the second price check, I just emphasize, ESI had offers. It had offers as to what it was willing to give Anthem in the way of what Anthem now says was worth billions of dollars. They declined it. And why did they decline it, Your Honor? The premises of Anthem. Where is the declination? Where is the evidence of the declination? I believe it's in the undisputed facts. And I'm sorry, I don't have the pinpoint for you. I will look for that. It's all in the confidential appendix citations, the area that we were just looking at. But there was a maximally aggressive position that Anthem took at the time of the second price check. There could be no consideration of the upfront payment. Their definition of competitive benchmark pricing is the best pricing available on the market that had to control the negotiation. They were simultaneously pressing wildly overinflated and unsubstantiated operational grievances against ESI. And they were unwilling to drop those, and they wouldn't give ESI any concessions in terms of the proposed new pricing terms. So the answer — It sounds like they didn't negotiate in good faith. But you're — I'm still troubled by this sort of stipulated, we didn't do the right thing here in order to cut off the damages theory without even understanding what is it that is supposed to have been in bad faith? It would be perfectly analogous to, I think, Goodstein, L7 Designs, and Fairbrook. Because there the defendants had breached, allegedly, and by way of the Court's assumption, a contractual duty to negotiate in good faith. And the rule that comes out of the case is consistently and uniformly, you cannot recover the sole measure of damages, the sole measure of remedy, that Anthem was offering. And that determined what Judge Ramos did. That meant that there were no damages, no damages that Anthem had offered that would be part of a breach of contract. Well, there was this theory of restitution. There was, Judge Oluye. At the very end, at summary judgment, was the first time that Anthem articulated it. There was no substantiation for that in the expert reports. There was no disclosure of that during discovery. It is settled by this Court's jurisprudence and the Southern District of New York's jurisprudence that Judge Ramos had discretion to exclude that theory as untimely disclosed. And there's no challenge by Anthem here to that being an abuse of discretion. You will not find that argument in either of their briefs. I'm puzzled because I thought you were going to say that restitution theory is really just an expectation theory. Because what they're asking to be restored to it is the prices that they would have gotten if they had succeeded in getting competitive pricing. I'll respectfully seek leave to adopt that as my second answer, Judge Lynch. That's the second point. But relatedly, even if, so I think you're exactly right. It doesn't feel like restitution because it's really something else. If they're relabeling benefit of the bargain damages under a different name, they're still running afoul of the same New York law that dictates the same outcome. But Judge Lynch, he's going to have rebuttal. So let me say, if he stands up here and says, no, our theory of restitution is a totally different theory of restitution that was restoring the parties to the ex-ante status quo and saying, here's the value of what ESI was providing over these 10 years. And here's what Anthem got from that. And here's the upfront payment and how that stirs in. And here's the amount by which Anthem calculated restitution amount. Well, you're not going to say that because that's not in the record. There's nothing like that in the record. They're massive discovery, tons of expert reports, nothing along those lines. So one way or another way or the other way, he can't pivot to restitution, Judge Loyer, to escape the same problem he has under New York law. And let me emphasize, parties in Anthem and ESI's position, sophisticated parties with high stakes, focused on this provision, they could select Delaware law instead of New York law. They didn't do that. Anthem could say, we don't want to have the upfront payment. We're going to basically make sure that we get a right, a strong right, to insist upon what we contend is competitive benchmark pricing. They could have negotiated for that. They didn't negotiate for that. They could have done things differently at the bargaining table. And then when it came time for the negotiations, they could have been reasonable. They could have said, okay, we're not going to say you get no credit for the upfront payment. We're not going to say that our definition of competitive benchmark pricing controls. We're not going to reject out of hand your desire to talk about extension of this term. And we're not going to say we have operational claims that are worth a tremendous amount of money that we're going to continue to come after you for. If they hadn't done those things, then Mr. Kurtz might have an argument to you about why you can predict that the outcome of the good faith negotiation would have landed at some point certain within range. But this is the easy case, Judge Loyer. This is the easy case where you have billions of dollars separating the parties. Their premises are worlds apart. And you would expect ESI, good faith negotiations are not self-destructive negotiations. ESI would be expected to remain, whether it was an allegation of bad faith or not. Thank you very much. Thank you, Judge Loyer. Thank you, Your Honors. There was a question about citation, Your Honor. It's confidential appendix 392 to 95. It's Anthem's rejection of the offers that ESI made in the course of the second price change. 392 to 95. Yes, Your Honor. Your Honors, maybe I can correct a few things in terms of our negotiation. Anthem, in fact, is the only party that negotiated. Anthem reduced its pricing demands five times until they were billions of dollars below what it had received for offers in the marketplace. It did not insist on the best pricing. It was prepared to take billions of dollars above best pricing. And, in fact, it was ESI that never moved, never changed their proposal except the time that they went from $3 billion the way they characterized it to. Secondly, Judge Lynch, you asked the question as to whether ESI had paid a premium, whether there was evidence. The evidence is exactly the contrary. ESI got fairness opinions from its bankers that the value of the company was a billion dollars in excess of the purchase price. That's at CA628. And that, in addition to that, ESI was receiving a billion dollars of tax advantages. That's at CA607 and 129. Your Honor, the theory that ESI has described here has been not getting credit for the upfront payment. But there's no disputing here that taking into account the upfront payment, ESI calculated it was going to receive $5 billion in excess of what it had modeled for itself and in excess of competitive pricing because market pricing had changed so substantially. Anthem is not seeking, as they say, any pricing that was rejected or traded away. Anthem is seeking to restore the pricing it had in 2009, which became inflated. Record, you referred several times, and some of it was acknowledged by Judge Loya's question, to extra record information. But you seem to be relying on the idea that this kind of provision is an industry standard of some kind. What, if any, evidence is there in the record of what the industry standards are? So the record evidence is ESI's admissions from its recipient witnesses with experience in this area plus expert witnesses, plus Anthem. I don't think it fairly has been disputed what a market check is. This is an industry where it's necessary. And, Your Honor, there's lots of industries, energy, construction, and commodities, where you need to have open pricing terms as pricing terms change in long-term contracts. This one may be of particular importance because it's medicines. It's commonplace to need to be able to adjust when your pricing is inflating, not because pricing has gone up, but because an input into your formula is producing inflated pricing. My question, so that's actually very helpful. My question was, of course, in all sorts of industries there are evaluation of market checks. But the question is, this provision in 5.6 that seems to permit, I know you disagree with this, but seems to permit ESI wide latitude in connection with accepting the proposal. So it's got some discretion in accepting or rejecting the proposal so long as it's done in good faith. And of course now, I think very cleverly, for different reasons, they've accepted for purposes of this appeal that they did not negotiate in good faith. And you get to the damages issue, which really should be the core of your rebuttal. Brad seems to eliminate the possibility of expectation damages as a matter of New York law. I want to get right to that, Your Honor. But I do want to at least note that all of the parties agreed that the third sentence in Section 5.6 was subject to the good faith requirement because you couldn't agree to terms and fail to document it. Judge Ramos, I think, got that right in finding it wasn't relevant because there was no failure to document agreed to terms. He never reached that issue. And before then moving to the Type 2 issue, which is so important, I did want to highlight a couple of pieces of evidence. So the argument here has been Anthem, they were allowed to take into account the upfront payment. Putting aside that taking into account the upfront payment resulted in their own calculation of receiving over $5 billion more than they were entitled to, there's not one mention of the upfront payment in Section 5.6 or anywhere else in the agreement. The testimony was that ESI never asked to be able to take into account the upfront payment in a market check, much less received an agreement on it. That ESI had asked to be able to take into account the upfront payment in a different pricing term, a most favored nation provision, and Anthem rejected it, explaining why it was not raised here. All these, however, are questions. In fact, let me move to the Type 2 agreement. So a Type 2 agreement is an agreement to agree. It's a term sheet. It's a memo of understanding. And the reason that one is not receiving expectation damages under those types of cases is because the parties didn't agree to transact, the parties didn't exchange consideration, and the parties, when they don't reach an agreement, are returned to the status quo ante without any damages at all. Anthem, as I mentioned, is bound by a fully binding agreement. Tractable says where you're within a fully binding agreement, Type 1, Type 2 case law does not apply. And in addition to the common sense bedrock principle about getting the benefit of the bargain, which even the Type 2 cases say, Type 2 cases say, and I think SIGA has it, Tractable has it, and the Heartland Leasing, Heart Rock Leasing has it, that you do get, you do get your bedrock principle of expectation damages where there's a showing that the parties could have reached agreement absent a breach or where terms are discernible through objective evidence. And here, it's an overwhelming record of objective evidence, including the terms precisely calculated by ESI for Anthem. In addition, as I mentioned earlier, to the terms for what they determined to be comparables and their company-wide guidelines as well. Thank you very much.